Samuels, J.
These two cases being, substantially, between the same parties, in regard to the same property, and depending upon the same facts, were heard together in this court. Many of the facts are set forth in the case of Evans & wife v. Spurgin, 6 Gratt. 107. The judgment in that case determined that the better right at law was in the demandants. After the judgment the tenant Spurgin and others, the heirs at law of Lantz, filed a bill in equity in the Circuit court of Preston county, in which county the land lies, against the heirs at law of Gilley C. Evans, (she and her husband John Evans being then dead,) to whom the legal title had descended. The sole purpose of this bill was to enjoin the judgment at law until the equity alleged in the other bill could be decided on. Spur-gin also filed a bill in the Circuit court of Monongalia county, impeaching the decree of April 1836, as being obtained by fraud on the part of Evans and wife. This fraud is alleged to have been perpetrated by removing the cause from the District court of chancery at Staunton to the Circuit court of Monongalia, and proceeding therein, as reported in 6 Grattan above *620 referred to, without revivor against Lantz’s heirs. The bill alleges that if the heirs had thus been made parties it would have been shown that Staley’s decree 18^7 had been fully satisfied; that Nimrod Evans, ™ mak™§ Hie purchase, was either acting as the agent of Staley, or that any interest he might have had uncier purchase was passed to Staley. That the claim, asserted by Staley in the chancery cause, and the claim of Nimrod Evans, whatever it was, were fully adjusted by Staley and Lantz with the privity of Evans. That an agreement in writing was entered into between Lantz and Staley on the 26th of November 1807, with the privity of Evans, by which Staley again sold to Lantz the land in controversy with other land, for one thousand eight hundred and fifty dollars, to be paid by Lantz to the credit of Staley with Henry Schroeder of Baltimore; that the price was paid accordingly, and that Staley on the 16th of August 1809, conveyed the land to Lantz as the contract required.
The facts alleged are established by satisfactory proof. The original agreement in writing is not produced; but a paper in the handwriting of Evans is exhibited purporting to be a copy of that agreement. The signatures of Staley and Lantz are not affixed to this copy: but that it truly sets forth the terms of the agreement is manifest from the facts that Lantz procured credit for Staley with Schroeder for the price of the land named in the copy, that is one thousand eight hundred and fifty dollars; and that this credit was as of the date of November 26th, 1807, the date of the alleged contract; and that Staley afterwards, on the 15th of August 1809, executed a deed to Lantz for the land described in the copy filed, which includes the land in controversy. The acts performed by Staley and Lantz, respectively, distinctly show what the contract was; and their long acquiescence *621 in the state of things resulting from those acts stamps the contract with absolute verity. So far as the claim of Evans’ heirs depends upon the decree in favor Staley, it is wholly without foundation in equity.
That Nimrod Evans was privy and consenting to the arrangement between Lantz and Staley, is as fully i i jy i ti i i pi shown as any such iact can usually be shown alter such a lapse of time. A paper is produced in the handwriting of Evans, setting forth the terms of the contract precisely as they were afterwards performed by Lantz and Staley respectively; this paper is endorsed in Evans’ handwriting, “J. Staley & D. Lantz. Agreement. Copy. N. E.” Evans never in anywise whatsoever exercised any act of ownership over the property, but left it in possession of Lantz and those claiming under him.- He was clerk of the County court of Monongalia county, and although the deed to himself from the commissioners in the chancery suit, had been admitted to record in his court, yet he never caused the alienation to be noticed on the land books of the commissioner of the revenue by withdrawing the taxes from Lantz and placing them to his own account. If the land was really his, his official duty required him to make the change; and his duty as a private citizen required him to cause the change to be made. The deed from Staley to Lantz was recorded in the office of which Evans was clerk; and under that deed the vendor and those claiming under him have held quiet possession until disturbed by Evans’ residuary devisee asserting a title which Evans himself never set up.
Upon all this I hold that Nimrod Evans had no title, good in equity, against Lantz and those claiming under them. It only remains to consider whether the appellees can set up their equitable title against the legal title held by the appellants. Several reasons *622 are alleged by tbe appellants why the equitable title shall not be now set up :
1. Laches.
2. The statute of limitations.
3. That the appellee Spurgin purchased the land with knowledge of the legal title held by Evans and wife.
In regard to the first: Lapse of time is justly allowed great weight in controversies about transactions long since passed. This weight, however, is thrown in favor of the party who insists that the state of things existing during that lapse shall not be disturbed. This is especially the case where the immediate parties to any given transaction are dead. It is presumed that any person having the right of property will ever use that right, such being the ordinary course of things. If no such right be exercised, the presumption is obvious that the right does not exist. In the cases before us, however, the appellees seek only to preserve the existing state of things; they and those under whom they claim have been in possession of the subject in controversy, and have held it since August 1809 at least. They are demanding nothing at the hands of the appellants; they seek only to defend their long continued actual possession, by means of their superior equitable title; a title fully proved by the direct testimony, and confirmed by the lapse of time. There is nothing in the record on which to found the allegation that the appellees or those under whom they claim have abandoned or waived their rights; on the contrary, from 1S05 or from 1809, they have in the most emphatic manner asserted those rights by holding and enjoying their property.
Second. As to the statute of limitations: To sustain this branch of the defense, the appellants rely upon 1 Rev. Code, p. 47-5-6, § 4. In considering this *623 objection it must be recollected that the bills before us are filed for the purpose of avoiding transactions occurring after the decree of 1807; and to prevent the fraudulent use of that decree. The nature of those transactions I have already considered. If we could even hold that the party was guilty of no actual fraud in removing the case from the court at Staunton to Monongalia, and proceeding therein without reviving against Lantz’s heirs and administrator, yet the gross disregard of the rights of others manifested in that proceeding is equivalent to fraud; it does all the mischief of fraud. The attempt of the appellants to enforce a mere legal title against a clear equitable title accompanied by long possession, is in itself a fraud; if innocent in acquiring the legal title, they are guilty of fraud in the attempt to use it. If we put ourselves in the place of the legislature, with the purpose of ascertaining the intention of the statute, we cannot suppose for a moment that it was intended to apply to such a case as this. The language of all public statutes is necessarily general; it is the duty of courts to determine their applicability to the circumstances of each particular case coming before them. The statute in question intends to quiet the possession of property acquired under decrees fairly obtained against absent parties, to bar any further litigation in the matter of the suit so decided, after seven years from the date of the decree. It does not intend to quiet parties in the enjoyment of property acquired under a decree fraudulently obtained; and this to the prejudice of parties fraudulently omitted.
Third. The third objection is without force: The vendors of the appellee Spurgin were in actual possession claiming title, and supposing that title to be good at law. In this they were mistaken; for the title, although clearly good in equity, was not good *624 at law. No reason can be assigned why a vendor in actual possession holding a good equitable title may not sell his title and deliver possession to another; the circumstance that another holds a legal title which may be called in at any time and conveyed to the real owner, cannot prevent the real owner from selling.
I am of opinion to affirm the decrees.
The other judges concurred.
Decrees affirmed.